**UNITED STATES of America, Appellant,**

v.

**ARCHER–DANIELS–MIDLAND COMPANY and Nabisco Brands, Inc., Appellees.**

**No. 87–2343.**

United States Court of Appeals, Eighth Circuit.

Submitted May 9, 1988.

Decided Dec. 15, 1988.

Rehearing and Rehearing En Banc Denied March 8, 1989.

---

David Seidman, Washington, D.C., for appellant.

J. Randolph Wilson, Washington, D.C., for appellees.

Before HEANEY and McMILLIAN Circuit Judges, and ROSS, Senior Circuit Judge.

HEANEY, Circuit Judge.

On June 12, 1982, Nabisco Brands, Inc. (Nabisco) leased to Archer–Daniels–Midland Co. (ADM) two corn wet milling plants. On December 14, 1982, the United States commenced an antitrust action in the United States District Court for the Southern District of Iowa, alleging that the lease creates an unreasonable restraint of trade in violation of section 1 of the Sherman Act and may substantially lessen competition in violation of section 7 of the Clayton Act. After substantial discovery, the parties made cross-motions for summary judgment. The trial court granted appellees' motion and ordered the government's complaint dismissed. 695 F.Supp. 1000. The district court held in substance that, based on the tests of reasonable interchangeability, cross-elasticity of demand and price correlation, high fructose corn

syrup (HFCS) and sugar are in the same relevant product market. We reverse and remand for further action consistent with this opinion, which concludes that sugar is not in the same relevant product market as HFCS.

## I.  BACKGROUND

This case involves sweeteners, primarily two different types of commercial sweeteners—sugar and HFCS. Sugar, technically called sucrose, is processed from either sugarcane or beet sugar. HFCS is a sweetener produced from corn.

In the early 1970's, new technology was sufficiently widespread to permit the processing of certain corn syrup products into a sweetener product by the use of enzymes capable of isomerizing the syrup into fructose. This process is used today to produce corn syrup containing 42% fructose (HFCS 42), 55% fructose (HFCS 55), and 90% fructose (HFCS 90). Although HFCS 42 is not as sweet as sugar, it may be used as a substitute for sugar in sweetening various products, such as canned fruits and vegetables. HFCS 55, a popular corn sweetener used by soft drink producers, is between 94% and 95% as sweet as sugar.

Since 1934, sugarcane and beet sugar growers have benefitted from either direct subsidies or sugar price supports enacted by Congress. The present price support program is due to expire in 1990. Because of the price supports, the price of HFCS has been lower than the price of sugar for a number of years.

The government presented evidence that if the lease between ADM and Nabisco was consummated ADM would be able, because of its newly established market position, to raise the price of HFCS to a level just below the price of sugar. ADM and Nabisco argue that—while the government's contention may be true—because sugar and HFCS are in the same relevant product market, ADM's market share of that market is not sufficient to constitute a violation of either the Sherman Act or the Clayton Act.

## II.  DISTRICT COURT OPINION

The district court held that sugar is in the same relevant product market as HFCS.

To determine product market, the court applied three legal tests: reasonable interchangeability, cross-elasticity of demand and price correlation. The court found that, since it is undisputed that HFCS and sugar are fully interchangeable as to use and to quality, the two products are reasonably interchangeable. The lower court also found that, because HFCS's lower price since its commercial introduction has caused substantial displacement of sugar in the market, there is cross-elasticity of demand between sugar and HFCS. This finding was substantiated by data demonstrating high cross-elasticity of demand between HFCS and sugar in Canada. (Sugar prices are not artificially supported in Canada.) Finally, the court found that the high degree of price correlation between sugar and HFCS also supports the appellees' contention.

Based on these findings, the district court determined that HFCS and sugar are in the same relevant product market.

## III.  THE GOVERNMENT'S ARGUMENT

The government argues generally that product market must be defined in a manner that permits evaluation of market power. From this premise, the government asserts that the district court erred in its use of the legal tests defining relevant product market.

The government contends that, under either the Merger Guidelines, U.S. Department of Justice, Merger Guidelines ¶ 2.0, *reprinted in* 2 Trade Reg.Rep. ¶ 4490, or the reasonable interchangeability test, the evidence that HFCS purchasers will not switch back to sugar as long as HFCS remains cheaper is sufficient to establish that sugar and HFCS are not in the same product market. It asserts that the district court erred in ignoring how this price differential affects competition between HFCS and sugar. Because the two products are functionally equivalent as to use and quality, price differential must, accord-

ing to the government, play a heightened role.

Secondly, the government argues that the district court erred in relying on simple cross-elasticity of demand rather than high cross-elasticity of demand because only high cross-elasticity demonstrates effective competition. In addition, the government asserts that the court based its finding of cross-elasticity on irrelevant evidence.

The government's final argument is that there is still a question of fact as to whether there is a high degree of price correlation.

## IV. NABISCO'S AND ADM'S ARGUMENT

ADM and Nabisco ask us to summarily affirm the district court because that court relied on the correct legal tests and undisputed evidence. The theme of their argument is that one must establish the relevant product market first, before one can measure market power.

They specifically argue that the functional interchangeability as to use and quality between sugar and HFCS is sufficient to meet the reasonable interchangeability test. ADM and Nabisco also argue that cross-elasticity of demand is relevant even if the amount of cross-elasticity is not high. In particular, the appellees argue that the movement of sugar consumers to HFCS is not, contrary to the government's argument, irreversible. Finally, the government's own evidence demonstrates an extremely high degree of price correlation.

The appellees reject several of the government's arguments. To reject the government's price differential theory, they assert that a plethora of authority states that even a substantial price difference is insufficient as a matter of law to place two products into separate markets. To reject the government's reliance on the Merger Guidelines, ADM and Nabisco argue that the barometer of a five percent increase, suggested in the Guidelines, permits the exclusion of any product that is selling at a price differential of greater than five percent. To reject the assumption that the movement of buyers to HFCS from sugar is irreversible, the appellees point to the testimony of several buyers stating that their companies have threatened to buy sugar in lieu of HFCS unless HFCS producers lowered their price.

## V. DISCUSSION

■ This case is before us on summary judgment. Because of that, our discussion is limited to the question of whether sugar belongs in the same relevant product market as HFCS. Summary judgment in an antitrust case is mandated, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The suggestion that a different, heightened standard applies in complex antitrust cases is incorrect. *City of Mt. Pleasant, Iowa v. Assoc. Elec. Co-op.*, 838 F.2d 268, 274 (8th Cir. 1988). Our focus is therefore to determine whether summary judgment was properly granted for Rule 56(c) of the Federal Rules of Civil Procedure under the standard set forth in *Celotex Corp. v. Catrett.*

Antitrust legislation does not exist in a vacuum. Its goal is full and free competition in the marketplace. The various legislative acts were inspired both by public opposition to trusts and holding companies in the late nineteenth century and by a historical hostility to monopolies stemming from colonial time. Their premise is that the unrestrained interaction of competitive forces will yield the best allocation of resources. The primary method of assuring a free competitive economy in the United States is by legislation prohibiting unfair methods of competition, such as the acquisition of monopoly power and acquisitions that may substantially lessen competition. In essence, these two prohibitions regulate private business behavior because of the fear of unjustified power in the hands of a small minority.

■ The lawfulness of an acquisition turns on the purchaser's potential for creating, enhancing, or facilitating the exercise of market power—the ability of one or more firms to raise prices above competitive levels for a significant period of time. *See United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391, 393, 76 S.Ct. 994, 1005, 1006, 100 L.Ed. 1264 (1956) (*Cellophane*).

■ The boundaries of the product market of a particular product can be determined by the reasonable interchangeability or cross-elasticity of demand between itself and possible substitutes for it. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). Reasonable interchangeability and cross-elasticity of demand are not used to obscure competition but to recognize competition, or the lack of competition, to the extent such exists. *United States v. Continental Can Co.*, 378 U.S. 441, 453, 84 S.Ct. 1738, 1745, 12 L.Ed.2d 953 (1964); *Brown Shoe Co. v. United States*, 370 U.S. at 326, 82 S.Ct. at 1524. Or, in other words, these concepts help evaluate the extent competition constrains market power and are, therefore, indirect measurements of a firm's market power.

■ We accept the finding that sugar and HFCS are functionally interchangeable for all uses for which HFCS is suitable, but we cannot ignore the fact that Congress has enacted a sugar program that has artificially inflated the price of sugar. As a result, the domestic price of HFCS has been 10%–30% lower than the price of sugar. Because of lower price, many buyers of sugar have turned to HFCS. As long as an effective price support program is in existence, a monopolist of HFCS will be able to raise the price of HFCS to just below the supported price of sugar before being constrained by the competitive forces of sugar. In other words, the HFCS monopolist is able to exercise excess market power.

If, at some time in the future, the government decides to eliminate the price supports, the price of sugar at that time may or may not constrain the price of HFCS, and we may have to take another look at this product market.

■ While sugar and HFCS are functionally interchangeable, they are not reasonably interchangeable because of the price differential between the two products.

The varying circumstances of each case determine the result. In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that "part of the trade or commerce," monopolization of which may be illegal.

*Cellophane*, 351 U.S. at 395, 76 S.Ct. at 1007 (footnote omitted).

The three most relevant factors used to determine reasonable interchangeability are use, quality and price. *Id.* at 404, 76 S.Ct. at 1012. Sugar and HFCS are admittably similar in use and quality. While generally a price differential, even a substantial one, is irrelevant for purposes of determining reasonable interchangeability, a large price differential as a result of a government price support raising the price of one product, but not the other, to an artificially high level is a relevant factor. This is true because of the inability of the price supported product to constrain the price of the other product. The artificially high price of sugar does not constrain the price of HFCS; thus, the competition from sugar does not regulate HFCS producers' business behavior. Competition between HFCS producers may be necessary to accomplish this goal. The price differential between sugar and HFCS, at least as a result of government price supports, is sufficient to show that sugar is not reasonably interchangeable with HFCS and thus does not belong in the same relevant product market with HFCS.

On January 29, 1988, this Court handed down an opinion in *City of Mt. Pleasant, Iowa v. Assoc. Elec Co-op.*, 838 F.2d 268 (8th Cir.1988). The appellees assert that

*Mt. Pleasant* controls the instant case. We disagree.

In *Mt. Pleasant,* the City of Mt. Pleasant, Iowa, alleged that a group of interrelated cooperatives, which received financial assistance from the United States government, acting together to produce and distribute electric power violated both the Sherman Act and the Clayton Act by charging the City higher prices than they charged their own member customers. The district court granted summary judgment in favor of the cooperatives. We affirmed on the following grounds.

(1) As to the Section 1 conspiracy claim, we held that the City failed to demonstrate that there was price competition between the cooperatives. *Id.* at 277. We said:

> The record bears out defendants' claim that the cooperative organization is a single enterprise pursuing a common goal—the provision of low-cost electricity to its rural members. The burden is therefore on the City to show specific facts which present a triable issue as to whether any of the defendants has pursued interests diverse from those of the cooperative itself. By "diverse" we mean interests which tend to show that any two of the defendants are, or have been, actual or potential competitors * * *.

>    *     *     *     *     *     *

> Even though the cooperatives may quarrel among themselves on how to divide the spoils of their economic power, it cannot reasonably be said that they are *independent sources* of that power. Their power depends, and has always depended, on the cooperation among themselves. They are interdependent, not independent.

>    *     *     *     *     *     *

> There is no indication that there was price competition between Associated and either Central or Northeast. We cannot see that this kind of dispute tends to make the members less dependent on one another for their economic power.

*Id.* at 276–77 (citations omitted).

(2) As to the Robinson–Patman price discrimination claim, the district court held that the intra-enterprise transfers between cooperatives were not "sales" for purposes of Robinson–Patman, and the court therefore granted summary judgment. We affirmed.

> The City complains that Northeast's higher prices to it than to the distribution cooperative surrounding the City hamper its ability to compete at retail. But in reality the cooperative association is a single enterprise, and the City competes at retail not just with the neighboring distribution cooperative, but with Northeast, Associated, and all the other G & T and distribution cooperatives as well.

>    *     *     *     *     *     *

> [Thus,] it would, in our opinion, be completely anomalous to hold, on the one hand, that the cooperative is a single enterprise which cannot conspire with itself under the Sherman Act, and, on the other hand, that the same single enterprise cannot enjoy the fruits of vertical integration by transferring goods between its constituent units at a "price" below what it charges customers.

*Id.* at 278–79.

(3) As to the City's monopoly claims, we held that there was no basis in the record from which a juror could reasonably infer that the cooperative dominated the wholesale supply market to the extent that the cooperative had a monopoly in it. *Id.* at 279. We stated that even if every reasonable inference was resolved in the City's favor, the City had nonetheless failed to set forth evidence of the cooperative's market power in the relevant geographic area. *Id.* The mere fact that Congress subsidized the cooperatives and enabled them to produce electricity at a lesser cost than non-cooperative sources does not obligate the cooperatives to sell power to members and non-members at the same price. *Id.* at 279–80.

> [A]re we to say that what Congress gives with one hand it has made illegal with the other? We think not.

*Id.* at 280.

In other words, Congress *intended* that the cooperatives would make power available to their members scattered over long

distances at a lower cost than the cost of power at market rates.

As to the City's second monopoly claim that the cooperative controlled the only transmission lines capable of supplying power to the City, we held that the mere possession of such economic power is not unlawful. *Id.* It is not mere monopoly (a status or condition), but rather monopolization (an activity) that Section 2 condemns. *Id.*

*Mt. Pleasant* is unlike the instant case. While both deal with the issue of the effect of a government subsidy on market definition, nowhere in the instant case is there any indication of an intent on the part of Congress to permit HFCS producers to use the sugar subsidy to raise the price of HFCS. Congress intended, by passing the price support program, that only the price of sugar and not the price of HFCS may be raised above competitive levels. The subsidy to the cooperative in *Mt. Pleasant* tends to drive prices down, effectively constraining the price of the unsubsidized competitors, but the price supports to sugar can only effectively constrain the price of HFCS at a certain level. If we permit the elimination of competition among the HFCS producers, it may have the effect of increasing the price of HFCS to consumers. Congress could not have intended such a result.

■ Additionally, no evidence exists at the present time demonstrating a high cross-elasticity of demand between sugar and HFCS. Whether two particular products belong in the same relevant product market can be demonstrated by the extent of cross-elasticity of demand between the two products; in other words, the readiness and ability of consumers of one product to turn to the other product. *Cellophane*, 351 U.S. at 400, 76 S.Ct. at 1010; *Unit-*

*ed States v. Empire Gas Corp.*, 537 F.2d 296, 303 (8th Cir.1976). To be relevant, the cross-elasticity of demand must be sufficiently high to statistically reflect consumers' perception that the two products are reasonably interchangeable. *See United States v. Empire Gas Corp.*, 537 F.2d at 303. "The greater the positive cross-elasticity of demand between two products is, the closer substitutes they are." *Smith Kline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3rd Cir.), *cert. denied*, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978); *see also Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C.Cir.1986) (the higher the cross-elasticity of demand is, the more likely the two products are in the same relevant product market), *cert. denied*, 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987). Because of the significant price difference between HFCS and sugar, a small change in the price of HFCS would have little or no effect on the demand for sugar.[1] The cross-elasticity of demand between HFCS and sugar is low, evidencing that the two products belong in different product markets.

## VI. CONCLUSION

We hold that the district court erred in granting summary judgment that sugar is in the same relevant product market as HFCS. We, in turn, grant summary judgment to the appellant that sugar is *not* in the same relevant product market as HFCS. We therefore reverse and remand in accordance with the standards set forth above.

ROSS, Senior Circuit Judge, dissenting.

For the reasons set forth in the district court's opinion, *United States v. Archer-*

---

**1.** The district court relied on two erroneous findings to conclude that there is sufficient cross-elasticity of demand between sugar and HFCS to demonstrate that the two products belong in the same relevant product market. The evidence of the substantial displacement of sugar by HFCS is irrelevant because this displacement focuses on static, rather than dynamic, price and demand relationships. The appropriate question is whether a slight increase in the price of HFCS causes a considerable number of buyers of HFCS to switch to sugar. The evidence of high cross-elasticity of demand between sugar and HFCS in Canada is also irrelevant because the market conditions in Canada differ radically from the market conditions in the United States. When, and if, Congress allows sugar and HFCS to compete in market conditions similar to those that exist in Canada, this Canadian evidence will then be relevant.

*Daniels–Midland Co.,* 695 F.Supp. 1000 (S.D. Iowa 1987), I cannot agree with the majority's conclusion that HFCS and sugar do not belong in the same relevant product market.   Accordingly, I respectfully dissent on the basis of the district court's opinion.